## FITCH v. HUFF.

(Circuit Court of Appeals, Fourth Circuit. September 8, 1914.)

### No. 1165.

**1. COURTS (§ 307\*) — JURISDICTION OF FEDERAL COURTS — DIVERSE CITIZENSHIP — CHANGE OF WIFE'S DOMICILE.**

Where a citizen's wife has justifiedly left him and removed to another state, with no intention of living elsewhere, she thereby acquires a domicile in such state, so that she may maintain an action in the federal courts against a citizen of the state in which her husband resides.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 850-854; Dec. Dig. § 307.\*

Diverse citizenship as a ground of federal jurisdiction, see notes to Shipp v. Williams, 10 C. C. A. 249; Mason v. Dullagham, 27 C. C. A. 298.]

**2. TRIAL (§ 260\*) — REQUESTS TO CHARGE — INSTRUCTIONS GIVEN.**

Refusal to submit instructions tendered is not error, where the charge given fairly and impartially states the law arising on the facts submitted to the jury.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 651-659; Dec. Dig. § 260.\*]

**3. ASSAULT AND BATTERY (§ 35\*) — EVIDENCE.**

In an action for assault and battery, evidence *held* to sustain a verdict for plaintiff.

[Ed. Note.—For other cases, see Assault and Battery, Cent. Dig. § 51, Dec. Dig. § 35.\*]

**4. ASSAULT AND BATTERY (§ 42\*) — ACTIONS — QUESTIONS FOR COURT AND JURY.**

Where, in an action for injuries from assault, the evidence is such that reasonable men might reasonably differ as to the inferences to be drawn therefrom, it is the court's duty to submit the case to the jury.

[Ed. Note.—For other cases, see Assault and Battery, Cent. Dig. § 56; Dec. Dig. § 42.\*]

**5. APPEAL AND ERROR (§ 1004\*) — ALLOWANCE OF DAMAGES — REVIEW.**

The Circuit Court of Appeals will not reverse a judgment for the trial court's refusal to grant a new trial because of alleged excessive damages, unless at first blush the damages appear to be outrageous and excessive, or it is apparent that some improper element was taken into account by the jury in determining the amount.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3944-3947; Dec. Dig. § 1004.\*]

**6. ASSAULT AND BATTERY (§ 40\*) — DAMAGES — EXCESSIVENESS.**

Where a wife, estranged from her husband, went to his room at night, and after retiring was ordered to leave, and on her refusal was attacked by defendants, handcuffed, gagged, roughly handled, and finally carried, half-dressed, to jail, where she was further beaten and maltreated, a verdict allowing her $6,000, which she voluntarily reduced to $3,000, was not excessive.

[Ed. Note.—For other cases, see Assault and Battery, Cent. Dig. § 55; Dec. Dig. § 40.\*]

In Error to the District Court of the United States for the Southern District of West Virginia, at Huntington; Benjamin F. Keller, Judge.

Action by Lillian M. Huff against R. L. Fitch and others. Judgment for plaintiff, and defendant Fitch brings error. Affirmed.

\*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

218 F.—2

Geo. S. Wallace, of Huntington, W. Va., for plaintiff in error.

H. C. Warth and J. W. Perry, both af Huntington, W. Va. (Warth & McCullough, of Huntington, W. Va., on the brief), for defendant in error.

Before PRITCHARD, KNAPP, and WOODS, Circuit Judges.

PRITCHARD, Circuit Judge. Lillian M. Huff, plaintiff below, instituted suit in the District Court of the United States for the Southern District of West Virginia against Joe Wisener, R. L. Fitch, and O. MacAllister, defendants below, for the recovery of $10,000. The declaration contains two counts; the first charge being assault, and the second one assault and false imprisonment.

A plea of not guilty was entered, the case tried before a jury, and a verdict rendered against Wisener and Fitch for $6,000, and, before judgment was entered thereon, the plaintiff asked for a remitter and reduced the amount of said judgment to $3,000, and upon said verdict, so reduced, a judgment was entered against the defendants, Wisener and Fitch, MacAllister not having been served with process, to which judgment defendants excepted, and the case comes here on writ of error.

Hereinafter the defendants in error will be referred to as plaintiff, and the plaintiff in error will be referred to as defendant; such being the respective positions the parties occupied in the court below.

The plaintiff was married at Columbus, Ohio, November 30, 1908. It appears from the testimony that her husband, some time prior to the institution of this action, had secured a divorce from his wife in the circuit court, but that the plaintiff had taken an appeal to the Supreme Court of West Virginia, which was pending at the commencement of this action. It also appears that the plaintiff and her husband were living separate and apart at the time the alleged injuries occurred, and that her husband was staying with one Bryant, in a room rented from the defendant Fitch. The plaintiff was introduced as a witness in the court below, and among other things testified as follows:

That her home was in Cleveland, Ohio, at the time of the institution of this suit; that she had lived there all her life, except the time she lived with her husband at Kimball; that the assault occurred in the lodging house owned by Mr. Fitch; that on the evening of September 25, 1910, she had gone to the room of her husband to see about getting a pass to Cleveland, and also to tell him that she was without proper clothing; that at times he would promise to grant her request, and then would refuse to do so; that he dragged her out in the hall by her feet, and told her that she could not stay there; that he said that she was crazy, and threatened her with a revolver, beat her with a brush, and again told her that she could not stay there; that he went out, saying that she could not stay there overnight; that while he was gone she undressed and went to bed, feeling that by so doing they would not put her out of the room; that she heard parties coming up the stairs, whereupon she pulled up the blanket and wrapped it around her, with her arms out; that her husband told her he would

throw her out anyway, and she was frightened and screamed, fearing that he would throw her out in her naked condition; that he went out and got Mr. Fitch, Joe Wisener, and Mr. MacAllister; that she had never seen Wisener; that she asked Mr. MacAllister if he were a policeman, and he said that he was not that day; that she asked them what right they had in there, telling them that she was undressed and in bed, and in her husband's room; that her husband said that he had rented it to another man, and upon inquiry Mr. Fitch said that her husband had rented the room from him, but that he had rented it in his name for another man, who occupied the room with him; that plaintiff replied that it was a trick, to which her husband responded, "I did it, so's to have a right here;" that they said they would put plaintiff out; that they picked her up and began to beat her; that Mr. Fitch held her by one hand and Wisener had her about the waist; that they pulled her out of bed, and bumped her up and down against the bed and the floor; that she ceased to struggle after that; that her husband became frightened when he saw how they treated her, and ran into the corner of the room; that MacAllister held her mouth shut with one hand and her nose with the other; that she said to them, "You know I've got a weak heart; do you want to kill me?" that she repeated this several times, but that they continued to beat her, during which time she continued to throw her head up in order to get fresh air; that Wisener laughed, and said that he thought it strange that she did not make a move to help herself; that then they got a towel and stuffed it in her mouth, and at last Wisener told some one to get a pair of handcuffs, and when they got them they handcuffed her arms behind her so far that they tore some of the tissue, and also tore all the cover off of her; that this was about 10 o'clock; that it was 8 o'clock when she went to her husband's room; that she begged them to let her go, telling them that if they would do so that she would dress and leave; that they said, "All right," but Mr. MacAllister said, "I will stay in the room," to which plaintiff replied, "No; I have nothing on but this blanket," whereupon MacAllister again said that he would stay, to which plaintiff responded, "Then I won't dress while you stay;" that MacAllister called her a bad name, and put the handcuffs back on her; that Mr. Fitch and Wisener helped hold her all the time; that MacAllister had her mouth shut when people, negroes and white men, were looking on; that they took her through the streets, with nothing but a sheet over her; that they said they were going to take her where she boarded, but instead of doing so they started to the jail with her; that she said to them, "I will certainly punish you for this if there is any law in West Virginia to do it; you can't treat a respectable woman like you are treating me;" that when they reached the jail Wisener threw her over into a corner; that he tried to assault her, whereupon she screamed, and went into hysterics, and called for her father; that she was nearly out of her mind; that she turned to Mr. Fitch and said to him, "Are you going to let these men do what they please?" to which he replied, "It's none of my business what they do;" that Fitch was with her all the time, and helped to beat her in the room; that they became fright-

ened when she began screaming again, and threw her in a cell; that in about 10 or 15 minutes she got the handcuffs off; that when they took the handcuffs off blood started out around where the chain pieces were placed; that she remained in jail until midnight, when they brought Mollie, the housekeeper where she was staying; that Mollie took her out and they went to the doctor's; that she was not screaming all the time, as it was possible to scream only once in a while, because they had her mouth shut. The witness further testified, in response to a question as to the effect to the treatment she had received, that:

"The tenth day I was suffering; even when I would move a finger, I could cry with the pain, I was so sore. Where Wisener had got hold of me, and pinched me so, the marks of his hands were on me."

George Whitt was called as a witness, and, among other things, testified as follows: That on the night in question he was standing at the west end of the telegraph office, and saw them carrying plaintiff down the street to the jail; could not tell who all were engaged in the effort of taking her to jail; that there were about four or five who had hold of her; that the plaintiff did not have any clothes on.

Mrs. Counts, wife of the assistant prosecuting attorney for the county of McDowell, testified that she made an examination of Mrs. Huff's body, and as a result found some bruises and blue marks, and "it seemed as though she had been handled rough"; that she was nervous and seemed to be sick.

Mrs. Mollie Price, another witness, testified that at the instance of her husband she went down to the jail, where she found Mrs. Huff in a nervous condition, crying and calling for witness; that at that time she did not have all her clothes on; that witness accompanied her to the doctor's office; that the next morning she saw the plaintiff's body; that it was bruised, and she saw prints of hands on her breast and shoulder.

The defense introduced F. H. Huff, husband of the plaintiff, who testified that he had been divorced by the circuit court, but that the case was still pending in the Supreme Court. The witness also testified that his wife came to the room that he was occupying and acted in a disorderly manner; that finally she pulled off her clothes and got in bed, and he told her that if she did not behave that he would have her arrested; that the officers came and put her clothes on her, and wrapped her in a sheet. Witness said that Mr. Fitch did not have anything to do with the matter; that after he had put her out in the hall she had tried to break the door down; and that in lunging against the door she injured one of her breasts.

Defendant Fitch was also introduced as a witness by the defense, and testified that he did not order the officers to arrest her, and that he had nothing to do with the arrest. He further testified that he did not aid them, either in the room or while on the way to the jail; that he at no time took hold of the plaintiff.

A number of other witnesses also testified as to the conduct of the plaintiff, stating, among other things, that she was screaming and acting in a violent manner. Some of these witnesses corroborated the

testimony of defendant Fitch to the effect that he did not assault the plaintiff or assist in taking her to the jail.

[1] There are several assignments of error, one of which is to the effect that the court below was without jurisdiction; in that the plaintiff's husband was a citizen and resident of the state of West Virginia at the time of the commencement of this action. The same question arose in the case of Williamson v. Osenton, 211 Fed. 1023, 127 C. C. A. 667, heard at the ——— term of this court. In that case the facts are almost identical with those of the case at bar. The question as to whether the court had jurisdiction in that case was certified to the Supreme Court of the United States, and the court answered the question propounded in the affirmative. 232 U. S. 619, 34 Sup. Ct. 442, 58 L. Ed. 758.

In view of the rule announced by the Supreme Court in that case, as well as the allegations contained in the complaint, we are of opinion that the lower court had jurisdiction to hear and determine the questions involved in this controversy.

[2] It is insisted by counsel for defendant that the court below erred in refusing to submit certain instructions to the jury. Even if the court erred in refusing to submit some of the instructions tendered, nevertheless the charge fairly and impartially states the law arising upon the facts submitted to the jury, and thus any error the court may have committed was harmless, and therefore not prejudicial to the rights of the defendants.

[3] It is also insisted that the judgment of the lower court should be reversed upon the theory that the verdict of the jury is against the weight of the evidence. There is doubt as to who was to blame for the controversy which arose between the plaintiff and her husband immediately preceding the time when the officers were called upon to arrest her, and while much of her conduct is not to be commended, yet at the same time we can understand how a nervous woman, who was being roughly treated by her husband, could become exasperated to such an extent as to render her incapable of acting in a sane manner. Even if she had been entirely responsible for the difficulty with her husband, still he would not have been justified in dragging her out of the room by the heels. He could have easily gone out of the room and left her alone, and this, it seems to us, is what one possessed of human feeling would have done under the circumstances. But, instead of doing so, he sent for the proprietor and the officers, which had the effect of attracting a number of people, many of whom became willing spectators to what, in our opinion, was one of the most disgraceful scenes ever enacted in a civilized community.

The conduct of the officers was simply inhuman and outrageous, and inexcusable from any viewpoint, and the fact that the defendant Fitch permitted them to take the plaintiff from his premises, at a time when she was in bed and doing nothing whatever to injure his property, clearly indicated that he was indifferent, to say the least of it, as to the treatment the plaintiff received at the hands of the officials.

The testimony of the plaintiff, if true, would entitle her to a verdict against the defendants. Her evidence is to the effect that the

defendant Fitch, not only ordered her to leave the room, but also aided the officers in committing the assault upon her, and assisted them in carrying her to jail. On the other hand, a number of the witnesses for the defendant, as we have stated, testified that Fitch did not take hold of plaintiff, or otherwise aid in removing her from the room occupied by her husband, thus corroborating the testimony of the defendant, Fitch.

[4] Thus it will be seen that there is a direct conflict of evidence; the evidence of the plaintiff tending to sustain the allegations of the complaint, while the evidence offered by the defendants tended to show that they were not guilty of the unlawful acts as alleged. It is well settled that where the evidence is such that reasonable men might reasonably differ as to the inferences to be drawn therefrom, it is the duty of the court to submit the same to the jury for its determination. In this instance, there being a conflict of evidence, the learned judge who heard the case in the court below submitted the same to the jury with proper instructions, and, the jury having found in favor of the plaintiff, we are of opinion that the assignment of error as respects this point is without merit.

[5] It is also insisted that the verdict in this instance is excessive. We do not deem it necessary to enter into an extended discussion of this phase of the case. The rule is well stated in the case of Cleveland, etc., Railway Co. v. Hadley, 170 Ind. 204, 82 N. E. 1025, 84 N. E. 13, 16 L. R. A. (N. S.) 527, 16 Ann. Cas. 1, wherein the court said:

"The general principle is well established that this court will not reverse the judgment of the court below in refusing to grant a new trial on the ground of excessive damages, unless, at first blush, the damages assessed appear to be outrageous and excessive, or it is apparent that some improper element was taken into account by the jury in determining the amount. Michigan City v. Phillips (1904) 163 Ind. 449, 71 N. E. 205; Indianapolis St. R. Co. v. Schmidt (1904) 163 Ind. 360, 71 N. E. 201; Illinois Cent. R. Co. v. Cheek (1899) 152 Ind. 663, 53 N. E. 641."

In the case of Dimmey v. Railroad Co., 27 W. Va. 32, 55 Am. Rep. 292, the court of that state said:

If the jury is so satisfied, they are at liberty to allow "such damages as they shall deem a fair and just compensation" under the circumstances of each case. "They are not tied down to any precise rule."

Also the cases of Southern Railway Co. v. Bennet, 233 U. S. 80, 34 Sup. Ct. 566, 58 L. Ed. 860, decided by the Supreme Court, Oct. Term, 1913, and Herencia v. Guzman, 219 U. S. 44, 31 Sup. Ct. 135, 55 L. Ed. 81, are to the same effect.

[6] In view of the evidence bearing upon the question of damages, we are of opinion that the verdict in this instance was not excessive, and the same should not, therefore, be disturbed.

For the reasons hereinbefore stated, the judgment of the lower court is affirmed.

Affirmed.