905 F.2d 1529
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
COLSTAR PETROLEUM COMPANY, Plaintiff-Appellant,
v.
REALTY PARTNERS, INC., Defendant-Appellee,
and
Gary Digirolamo; Chubb Group of Insurance Cos., Defendants.
COLSTAR PETROLEUM COMPANY, Plaintiff-Appellee,
v.
REALTY PARTNERS, INC., Defendant-Appellant,
and
Gary Digirolamo; Chubb Group of Insurance Cos., Defendants.
 Nos. 89-2604, 89-2609.
 United States Court of Appeals, Fourth Circuit.
 Argued: Oct. 31, 1989.
Decided May 10, 1990.
 
 Appeals from the United States District Court for the Eastern District of Virginia, at Alexandria. James C. Cacheris, District Judge. (CA-88-451-A)
 John William Thyden, Springfield, Va. (Argued), for appellant; John Lockie, Robert J. Downey, Seattle, Wash., on brief.
 Rutherford Craig Jennings, Tina Lynn Simpson, Slenker, Brandt, Jennings & Johnston, Merrifield, Va. (Argued), for appellee; Michael L. Davis, Slenker, Brandt, Jennings & Johnston, Merrifield, Va., on brief.
 E.D.Va.
 AFFIRMED.
 Before CHAPMAN, Circuit Judge, HARRISON L. WINTER,* Senior Circuit Judge, and FREDERIC NELSON SMALKIN, United States District Judge for the District of Maryland, sitting by designation.
 PER CURIAM:
 
 
 1
 Both the plaintiff, Colstar Petroleum Co. ("Colstar"), and the defendant, Realty Partners, Inc. ("Realty Partners"), appeal orders entered by the district court at the conclusion of plaintiff's tort and breach of contract suit. The plaintiff appeals the granting of defendant's motion for a directed verdict, and the defendant cross-appeals the district court's ruling that Colstar established a prima facie case of negligence and the denial of its motion for summary judgment. We affirm both rulings.
 
 I.
 
 2
 This action stems from a fire in the Springfield Office Towers Building (Springfield Towers) in Alexandria, Virginia, on November 13, 1986. In July 1983, Realty Partners, the owner of the Springfield Towers, leased part of the ninth and all of the tenth floor to Colburn Energy Corp. (Colburn Energy). Colburn Energy, founded by Charles E. Colburn III, was an oil and gas exploration company that offered oil and gas drilling programs as limited partnerships for sale to the public. In August 1984, Mr. Colburn formed Colstar, which acted as the driller and maintainer of the oil and gas wells sold by Colburn Energy. Later that year, Mr. Colburn received oral permission from Springfield Towers' management to lease the remainder of the ninth floor to Colstar. In December 1986, Colburn Energy assigned its lease rights to Colstar.
 
 
 3
 On November 13, 1986, fire and smoke damage destroyed several floors of Springfield Towers, including the ninth and tenth floors. In April 1988, Colstar sued Realty Partners, alleging two counts of breach of contract and two counts of negligence. Colstar alleged that the failure of the smoke detector system to operate caused Colburn Energy to suffer business losses of two million dollars. At trial, on the issue of the negligence liability of Realty Partners, the plaintiff offered expert testimony showing that the fire originated from a smoldering cigarette in a plastic trash can on the eighth floor of Springfield Towers. The expert concluded that the fire had smoldered and burned for two and one-half to three hours before a passing motorist reported it. Colstar then produced another expert who stated that the building's smoke and fire alarm systems failed on the day of the fire because of a blown fuse in the building's main electrical system. The expert testified that local fire codes require an operational fire alarm system. Based on this testimony, the plaintiff argued at trial that had the fire alarm system been operational, the offices of Colburn Energy and Colstar would not have been damaged to the same extent.
 
 
 4
 On the issue of damages, Colstar introduced three exhibits, identified as C-1, C-2, and C-3. Exhibit C-1, called the Taylor-Surbine offering, constituted a joint venture drilling project that was offered for sale to investors. At trial, Mr. Colburn testified that Colburn Energy had found an underwriter, Crest Securities, to syndicate the Taylor-Surbine offering. Crest Securities began pre-selling this offering to some brokers in the early fall of 1986, and these brokers had indicated to Crest Securities that they could "sell the deal." The Taylor-Surbine offering was supposed to raise all its capital by November 15, 1986, and complete the drilling by January 1, 1987. By the date of the fire (November 13, 1986), however, the offering had failed to raise any capital. At this point, the district court became concerned with the speculative nature of plaintiff's damage evidence, and excused the jury. The court then proceeded to ask the plaintiff how it intended to prove damages. Colstar told the court that it had evidence of ten similar investment programs from 1982 to 1985 that had yielded between $3 and 4 million in pre-tax profits for Colburn Energy.[1] The court was also informed that 85% of these joint ventures closed within the last two months of the year.
 
 
 5
 Exhibits C-2 and C-3 consisted of Distressed Asset Funds, and were created by Colburn Energy to buy up the many petroleum businesses (at ten cents on the dollar) that were in bankruptcy in 1986. This was a new venture for the plaintiff. At trial, Colstar admitted that none of the ten previous investment programs concerned this type of distressed asset fundraising. Moreover, one Distressed Asset Fund, Exhibit C-2, was to close on June 30, 1986, if it had raised the minimum capital level of $300,000, and the other Distressed Asset Fund, C-3, was to close on November 30, 1986, if it obtained the same minimum. By the time of the fire, neither program had closed, and Colburn Energy had not gotten any money in from prospective investors.
 
 
 6
 After the district court heard this evidence, it directed a verdict for the defendant "on the ground that [Colstar has not] shown damages." Before directing the verdict for the defendant on this ground, the district court denied the defendant's motion for a directed verdict made on the ground that the proof was insufficient as to negligence, ruling instead that Colstar's witnesses had made out a prima facie case of negligence.[2] The district court had also denied the defendant's motion for summary judgment, which contended that the terms of the lease precluded Colstar from suing Realty Partners for lost profits. The parties appeal all these rulings.
 
 II.
 
 7
 The primary issue we must address is whether Colstar proved its lost profits with reasonable certainty. It is well settled that when an established business is interrupted and sustains loss, evidence of its past profits, and estimates of future profits derived therefrom, are admissible as a guide in calculating damages. Murray v. Hadid, --- Va. ----, ----, 385 S.E.2d 898, 905 (1989). Where a new business or enterprise is involved, however, evidence of projected profits is not admissible to quantify damages for economic loss. See Restatement (Second) of Torts Sec. 912 comment d (1977); Kay Advertising Co. v. Olde London Transportation Co., 216 Va. 273, 276, 217 S.E.2d 876, 878 (1975) ("without benefit of a history of business operations, it [is] impossible to predict, much less prove, prospective profits with the 'reasonable degree of certainty' the law requires").
 
 
 8
 In dismissing the plaintiff's damage evidence as too speculative, the district court explicitly relied on LaVay Corp. v. Dominion Fed'l Savings & Loan Ass'n, 830 F.2d 522 (4th Cir.1987), and Mullen v. Brantley, 213 Va. 765, 195 S.E.2d 696 (1973). In LaVay, the district court excluded evidence of lost profits concerning the plaintiff's mobile home project, which never got off the ground because the defendant bank backed out of the financing. In affirming this ruling, we stated: "[t]he rule barring an award of speculative profits generally precludes damages for lost profits caused by harm done to a new business." 830 F.2d at 529. Similarly, in Mullen, the Virginia Supreme Court ruled that evidence of prior profits from other company pizza parlors could not be used to show lost profits from a planned new pizza parlor. Despite the fact that Shakey's, the company that was constructing the new parlor, had made considerable profits from other Shakey establishments around the nation, the court held that "the establishment of such a pizza parlor [on the new site] would nevertheless have been a new business." 213 Va. at 769, 195 S.E.2d at 700.[3]
 
 
 9
 Colstar attempts to distinguish LaVay and Mullen by noting that Colburn Energy had been in the oil and gas business for seven years, in contrast to the above businesses, which were "mere contemplation." The Distressed Asset Funds and Taylor-Surbine offerings were not, the appellant argues, an "unbuilt small restaurant franchise," or a "planned mobile home park" (as in Mullen and LaVay ), but instead had programs that were "organized, in place, and had investors committed to purchase them."
 
 
 10
 We do not agree. The record leaves little doubt that, at least for the two Distressed Asset Funds, the offered ventures were new and risky. Just as in Coastland Corp. v. Third Nat'l Mortgage Co., 611 F.2d 969, 978 (4th Cir.1979), where we refused to let evidence of prior business success prove the lost profits for a planned condominium venture, the Distressed Asset Funds constituted new endeavors, the profits from which were far from secure. See also Murray, --- Va. at ----, 385 S.E.2d at 905 (damages too speculative because "townhouse development would have constituted a new enterprise dependent upon too many contingencies to safeguard an estimate of damages"). This conclusion is further bolstered by the fact that Colburn Energy had not met its minimum revenue targets at the time both Distressed Asset Funds were supposed to close.
 
 
 11
 As for the Taylor-Surbine offering, all Colstar actually established by its evidence was that the syndication had been prepared and some preselling to dealers had begun. Colstar may very well have realized its investment "but for the fire," but this is unlike the case where an established business, one that routinely makes commercial sales, has its activities interrupted. Rather, the Taylor-Surbine offering is similar to the proposed Shakey's Pizza Parlor in Mullen and the proposed condominium in Coastland: even though both companies in these cases had made money previously, the anticipated profits were based only on conjecture because these businesses were "adventure[s], the successful operation of which depends upon future bargains, states of the market, and on too many other contingencies." Coastland, 611 F.2d at 978. Consequently, we conclude that the district court ruled correctly in barring Colstar's damage evidence.
 
 III.
 
 12
 Realty Partners cross-appeals the district court's denial of its motion for a directed verdict on the liability issue on several grounds: it contends that Virginia law bars recovery of economic loss in tort actions; it contends that plaintiff never demonstrated that Realty Partners knew or should have known about the blown fuse; and it argues that Colstar failed to demonstrate proximate cause. We address these claims seriatim.
 
 A.
 
 13
 Citing Sensenbrenner v. Rust, Orling & Neale Architects, Inc., 236 Va. 419, 374 S.E.2d 55 (1988), the defendant maintains that Colstar's negligence claims should be dismissed because "[t]here can be no recovery in tort for economic losses." We do not view Sensenbrenner quite so broadly. In Sensenbrenner, the Virginia Supreme Court, responding to a question certified by this court, held that a homeowner could not sue an architect and pool contractor in tort for economic losses where these parties were not in privity of contract with the homeowner. 236 Va. at 425, 374 S.E.2d at 58. In dicta, the court went beyond the narrow certification issue and stated:
 
 
 14
 [t]he law of torts is well equipped to offer redress for losses suffered by reason of a 'breach of some duty imposed by law to protect the broad interests of social policy'.... Tort law is not designed, however, to compensate parties for losses suffered as a result of a breach of duties assumed only by agreement....
 
 
 15
 * * *
 
 
 16
 * * *
 
 
 17
 [Here], [t]he effect of the failure of the substandard parts to meet the bargained for level of quality was to cause a diminution in the value of the whole, measured by the cost of repair. This is a purely economic loss, for which the law of contracts provides the sole remedy.
 
 
 18
 Id. (citation omitted).
 
 
 19
 Rather than reading this language, as Realty Partners urges, as barring any type of tort recovery for economic loss (which would have worked a dramatic change in Virginia law),[4] we feel Sensenbrenner only limits such recovery when the parties are not in privity and where the plaintiff's complaint fails to allege a "breach of some duty imposed by law." 236 Va. at 425, 374 S.E.2d at 58. Cf. Copenhaver v. Rogers, 238 Va. 361, 366, 384 S.E.2d 593, 595 (1989) (Sensenbrenner bars tort claim for economic loss "absent privity of contract"). Here, however, Colstar and Realty Partners were in privity of contract. Moreover, Colstar claimed, "in addition to the duties owed pursuant to the contract of lease," a breach of "the obligation to use ordinary care in the operation of the building." See Complaint p 16-17. This is not a breach of a duty "assumed only by agreement," but rather stems from a duty "imposed by law to protect the broad interests of social policy." 236 Va. at 425, 374 S.E.2d at 58. Thus, Sensenbrenner does not require the dismissal of Colstar's negligence claims.
 
 B.
 
 20
 The defendant next contends that the district court erred in denying its motion for a directed verdict because Colstar never demonstrated that the defendant should have been on notice about the defective fire alarm system. We have held previously that the denial of a motion for a directed verdict cannot be disturbed unless we conclude that reasonable jurors could not have returned a verdict for the plaintiff. Cooper v. Dyke, 814 F.2d 941, 944 (4th Cir.1987). Viewing the evidence in the light most favorable to Colstar, we conclude that Realty Partners cannot meet this burden.
 
 
 21
 In essence, Realty Partners complains that Colstar failed to demonstrate notice because its evidence never showed "what time the fuse blew," and so the fuse could have blown "ten seconds before the fire, or ten days, or 100 days." The fuse may well have blown ten days before the fire, but the law does not require Colstar to pinpoint the exact time of the tortious event. It is enough to show that Realty Partners had a duty to make reasonable inspections and repairs of the alarm system, and that it failed to do so. See Gumenick v. United States, 213 Va. 510, 516, 193 S.E.2d 788, 793 (1973) ("If in the exercise of ordinary care the appellant landlords could have discovered the defective condition of the rail in time to have repaired it or replaced [it] prior to the occasion of plaintiff's fall and injury they should have done so.") (footnote omitted). The testimony of Colstar's witnesses demonstrated that the fire did not cause the fuse to blow, that Realty Partners violated local fire codes by not having independent electrical power for both the operation and execution of the alarm system, and that control of the electrical system was solely in the hands of Realty Partners. Given this testimony, the district court acted properly in rejecting the defendant's motion for a directed verdict on the issue of negligence liability.
 
 C.
 
 22
 The defendant's third contention, that Colstar never demonstrated that the blown fuse was the proximate cause of the fire, is similarly without merit. In Virginia, questions of negligence and proximate cause are questions for the jury unless reasonable persons could not differ on the facts and inferences drawn from the evidence, in which case such issues become questions of law for the court. Graddy v. Hatchett, 233 Va. 65, 69, 353 S.E.2d 741, 743 (1987). Here, "reasonable persons" could differ as to the cause of the destruction of Colstar's offices, and it seems probable that had the alarm system operated properly, at least some of the damage could have been avoided. This situation is thus unlike the one in Pepsi-Cola Bottling Co. v. Yeatts, 207 Va. 534, 151 S.E.2d 400 (1966), where the injured plaintiff could point to no reasonable cause of her accident: she just knew a Pepsi bottle fell and cut her leg, but she could not identify how or why the bottle fell. See 207 Va. at 536, 151 S.E.2d at 402-03. This plaintiff has presented more evidence on the cause and extent of its injuries, and the district court correctly rejected Realty Partners' motion for a directed verdict.
 
 IV.
 
 23
 Finally, Realty Partners contends that the district court erroneously refused to grant its motion for summary judgement. Just as in its motion, Realty Partners argues that Clauses 11.01(c) and (d) of the lease limit Colstar's recovery to that provided by its insurance coverage. Section 11 of the lease covers the duties of the tenants, and Clauses 11.01(c) and (d) state:
 
 
 24
 Tenant covenants and agrees ... (c) to provide and keep in force during the term of this Lease, for the benefit of Landlord and Tenant general liability insurance ... in the amount of ... Fifty Thousand Dollars ($50,000.00) in respect to property damage, in which Landlord shall be named as the co-insured ... (d) to maintain ... at Tenant's sole cost and expense, with Tenant as the party insured, ... fire and extended coverage insurance ... in an amount equal at all times to the replacement cost new of all property in the premises owned, leased or paid for in whole or in part by Tenant....
 
 
 25
 Realty Partners argues that the requirement of the lease to purchase property insurance covers "lost profits" and, because Colstar did not purchase insurance to cover this loss, it should not recover even if the defendant was negligent.
 
 
 26
 As an initial matter, we note that, when construing standard leases prepared by the lessor, "any ambiguities must be resolved in favor of the lessee." Monterey Corp. v. Hart, 216 Va. 843, 845, 224 S.E.2d 142, 144 (1976). As the defendant admits, neither subsection (c) nor (d) specifically required Colstar to procure "lost profits" insurance in addition to the $1.1 million property insurance policy Colstar already took out. Clause 11.01(c) only gives the landlord the right to purchase property insurance and charge the premiums back to the tenant if the tenant has not already purchased property coverage. As for Clause 11.01(d), there is no support for the interpretation that "all property in the premises owned, leased or paid for" by Colstar includes "lost profits." Indeed, in Sensenbrenner, supra, the Virginia Supreme Court rejected the argument that loss due to diminution of value constituted an injury to property (covered by tort law) and instead held that such an injury was merely "disappointed economic expectations." 236 Va. at 425, 374 S.E.2d at 58. Similarly, we interpret the ambiguous term "property" to mean injury to tangible, physical property and not "lost profits."
 
 V.
 
 27
 Accordingly, we conclude that the district court properly directed a verdict on the issue of damages and properly refused to grant defendant's motion for summary judgment or direct a verdict on the issue of negligence liability.
 
 
 28
 AFFIRMED.
 
 
 
 *
 Judge Winter participated in the hearing of this case at oral argument but died prior to the time the decision was filed. The decision is filed by a quorum of the panel. 28 U.S.C. Sec. 46(d)
 
 
 [1]
 The joint venture partner for the Taylor-Surbine offering, however, was a different one than the partners used in the prior successful deals
 
 
 [2]
 It is unclear how the district court ruled on the two breach of contract claims. After ruling on defendant's motions, the court stated that it was "iffy on" the breach of contract issue, and would "have to think about it some more."
 
 
 [3]
 The Mullen court also noted that when an established business, "with an established earning capacity, is interrupted and there is no other practical way to estimate the damages," evidence of prior business success would be admissible. 213 Va. at 768, 195 S.E.2d at 699
 
 
 [4]
 See, e.g., Blake Constr. Co. v. Alley, 233 Va. 31, 34, 353 S.E.2d 724, 727 (1987) (builder cannot sue architect for purely economic loss in tort because parties not in privity of contract); Bryant Elec. Co. v. City of Fredericksburg, 762 F.2d 1192, 1194-95 (4th Cir.1985) (Virginia law permits recovery of purely economic losses in a negligence action so long as the plaintiff is in privity of contract with the defendant)